

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | | |
|---|---|---|---|
| RONALD A. MCIVER, | § | | |
| Movant, | § | | |
| | § | | |
| vs. | § | CRIMINAL NO. | 8:04-0745-HFF |
| | § | CIVIL NO. | 6:08-70057-HFF |
| UNITED STATES OF AMERICA, | § | | |
| Respondent. | § | | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

This is a 28 U.S.C. § 2255 action.  Movant is represented by counsel.  Pending before the Court is Movant's § 2255 motion to vacate.  Having carefully considered the motion, the response, the reply, the record, and the applicable law, the Court is of the opinion that Movant's § 2255 motion should be granted in part and denied in part.

## II.    PROCEDURAL HISTORY

**August 10, 2004** --A Grand Jury for the District of South Carolina filed a fifteen-count Indictment with the United States Clerk of Court.

The Indictment provides the following:

### INTRODUCTION
**THE GRAND JURY CHARGES:**

That at all times material to this Indictment and with respect to each and every count contained herein:

1.    The Controlled Substances Act (Title 21, United States Code, Section 801 *et seq.)* and the associated portions of the Code of Federal Regulations issued pursuant thereto, and hereinafter

referred to collectively as The Act, governed, among other things, the distribution and dispensation of controlled substances.

2.     "Controlled substances", within the meaning of The Act, meant drugs, or other substances, including those found in Schedule II.

3.     Pursuant to The Act, the Drug Enforcement Administration issued licenses to practitioners, including physicians, to distribute and dispense, by way of prescriptions and otherwise, controlled substances for legitimate medical purposes in the usual course of professional treatments.

4.     **[MOVANT]** was a practitioner who possessed a license issued pursuant to The Act to distribute and dispense, including by way of prescriptions, controlled substances for legitimate medical purposes in the usual course of professional treatments.

## COUNT 1

**THE GRAND JURY FURTHER CHARGES:**

That beginning at a date unknown to the Grand Jury, but at least from in or about the summer of 2000, and continuing thereafter to in or about April 2004, in the District of South Carolina, **[MOVANT]**, using a special skill, knowingly and intentionally, did combine, conspire, confederate and agree and have a tacit understanding with various other persons, both known and unknown to the Grand Jury, to unlawfully distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than legitimate medical purposes, approximately 6,154 grams of oxycodone, a Schedule II controlled substance in the forms of OxyContin, OxyIR and Roxicodone; approximately 100.4 grams of hydromorphone, a Schedule II controlled substance in the form of Dilaudid; approximately 253.3 grams of morphine, a Schedule II controlled substance in the forms of Avinza and MSIR; and approximately 14,493 grams of methadone, a Schedule II controlled substance; and death and serious injury resulted from the use of the Schedule II controlled substances, in violation of Title 21, United States Code, Sections 84l(a)(1) and 84l(b)(1)(C).

In violation of Title 21, United States Codes, Section 846.

## COUNT 2

**THE GRAND JURY FURTHER CHARGES:**

That on or about June 22, 2001, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other

than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the form of approximately 10 (twenty milligram) units of OxyContin to another person referred to as "A".

In violation of Title 21, United States Code, Section, 841(a)(l) and Title 18, United States Code, Section 2.

## COUNT 3
**THE GRAND JURY FURTHER CHARGES:**

That on or about March 21, 2002, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the form of approximately 120 (eighty milligram) units of OxyContin and hydromorphone, a Schedule II controlled substance in the form of approximately 120 (four milligram) units of Dilaudid to another person referred to as "B".

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 4
**THE GRAND JURY FURTHER CHARGES:**

That on or about April 16, 2002, in the District of South Carolina **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the forms of approximately 100 (forty milligram) units of OxyContin and approximately 100 (five milligram) units of OxyIR to another person referred to as "C".

In violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

## COUNT 5
**THE GRAND JURY FURTHER CHARGES:**

That on or about April 19, 2002, in the District of South Carolina, the Defendant, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the form of approximately 28 (eighty milligram) units of OxyContin to another person referred to as "D".

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

3

## COUNT 6

**THE GRAND JURY FURTHER CHARGES:**

That on or about July 15, 2002, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the forms of approximately 90 (eighty milligram) units of OxyContin and approximately 200 (fifteen milligram) units of Roxicodone to another person referred to as "E".

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 7

**THE GRAND JURY FURTHER CHARGES:**

That on or about February 13, 2003, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the forms of approximately 120 (forty milligram) units of OxyContin and approximately 100 (five milligram) units of OxyIR to another person referred to as "F".

In violation of Title 21, United States Code, Section 841(a)(l) and Title 18, United States Code, Section 2.

## COUNT 8

**THE GRAND JURY FURTHER CHARGES:**

That on or about May 1, 2003, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the forms of approximately 140 (eighty milligram) units of OxyContin and approximately 100 (thirty milligram) units of Roxicodone to another person referred to as "G".

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 9

**THE GRAND JURY FURTHER CHARGES:**

That on or about May 22, 2003, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the form of approximately 200 (thirty milligram) units of Roxicodone to another person referred to as "G".

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 10

**THE GRAND JURY FURTHER CHARGES:**

That on or about July 19, 2002, in the District of South Carolina, the Defendant, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the form of approximately 150 (eighty milligram) units of OxyContin to another person referred to as "H".

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 11

**THE GRAND JURY FURTHER CHARGES:**

That on or about May 12, 2003, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the form of approximately 200 (eighty milligram) units of OxyContin to [Larry Shealy] resulting in the death of that person on or about May 29, 2003, from the use of the controlled substance distributed by the defendant on or about the aforesaid date.

In violation of Title 21, United States Code, Section 841(a)(l) and Title 18, United States Code, Section 2.

## COUNT 12

**THE GRAND JURY FURTHER CHARGES:**

That on or about May 28, 2003, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and

dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the form of approximately 300 (thirty milligram) units of Roxicodone to [Larry Shealy] resulting in the death of that person on or about May 29, 2003, from the use of the controlled substance distributed by the defendant on or about the aforesaid date.

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 13

**THE GRAND JURY FURTHER CHARGES:**

That on or about May 22, 2003, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the form of approximately 225 (eighty milligram) units of OxyContin; morphine, a Schedule II controlled substance, in the forms of approximately 20 (one hundred twenty milligram) units of Avinza and approximately 150 (thirty milligram) units of MSIR; and approximately 450 (forty milligram units) of methadone, a Schedule II controlled substance, to another person referred to as "I".

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 14

**THE GRAND JURY FURTHER CHARGES:**

That on or about March, 9 2004, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II controlled substance, in the form of 120 (eighty milligram) units of OxyContin to another person referred to as "J".

In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

## COUNT 15

**THE GRAND JURY FURTHER CHARGES:**

That on or about March 11, 2004, in the District of South Carolina, **[MOVANT]** did knowingly and intentionally use a special skill to distribute and dispense and cause to be distributed and dispensed, outside the usual course of medical practice and for other than a legitimate medical purpose, oxycodone, a Schedule II

> controlled substance, in the form of 200 (thirty milligram) units of Roxicodone to another person referred to as "J".
>
> In violation of Title 21, United States Code Section, 841(a)(1) and Title 18, United States Code, Section 2.

(Indictment 1-12.)

**August 26, 2004--**An arraignment was held before United Stated Magistrate Judge Bruce H. Hendricks at which time Movant pled "Not Guilty" as to all counts.

**April 6, 2005--**Jury selection was conducted in preparation for the trial of this case.

**April 11, 2005--**The jury trial that is the subject of the present motion commenced this date.

**April 19, 2005--**The jury returned with a verdict. Jury found Movant guilty as to Counts 1, 3, 4, 5, 11, 12, 13, 14, and 15. The jury found him not guilty as to Counts 2, 6, 7, 8, 9, and 10.

**August 26, 2005--**The Court sentenced Movant to a term of 240 months incarceration as to Counts 1, 3, 4, 5, 13, 14, and 15 and 360 months incarceration as to Counts 11 and 12. The sentences are to run concurrently. Subsequent to his incarceration, Movant will be in supervised release for a period of five years.

**August 31, 2005--**Movant filed his Notice of Appeal.

**September 19, 2005--**The Court entered its final judgment in the case.

**December 5, 2006--**The Court of Appeals for the Fourth Circuit affirmed the judgment of this Court in a published opinion. *United States v. McIver*, 470 F.3d 550 (4th Cir. 2006).

**May 14, 2007--**The United States Supreme Court denied Movant's petition for certiorari.

**May 12, 2008--**Movant's § 2255 motion was filed with this Court.

**June 30, 2008--**Respondent filed its response in opposition to Movant's § 2255 motion.

**August 12, 2008--**Movant filed his reply to Respondent's response to his motion.

Counsel for Movant subsequently informed the Court that he was "explor[ing] the possibility of some sort of early release from the Bureau of Prisons" for Movant after Movant was diagnosed

with cancer. (July 22, 2009, Letter from Counsel for Movant 1.) According to that letter, it was counsel's "understanding . . . that the cancer began in [Movant's] prostate, but has now spread throughout his body, and that his prognosis is very dire." *Id.*

The Court informally requested that counsel keep it apprised of Movant's status regarding early release. By letter to the Court dated May 5, 2010, counsel informed the Court that Movant "is not, at this time, being considered for any type of release based on his medical condition." (May 5, 2010, Letter from Counsel for Movant 1.)

## III.    CONTENTIONS OF THE PARTIES

Movant states just one ground for relief, ineffective assistance of counsel. He then sets forth four areas in which his counsel was ineffective. Taken directly from the petition, they are:

> 1) [Movant] was alleged to have caused the death of decedent by illegally dispensing drugs. The Government alleged that decedent died of a drug overdose. Defense counsel failed to consult with or call an expert witness to determine the true cause of death. Had trial counsel so consulted, he would have found that the Government's conclusion was erroneous and based upon faulty analysis. 2) Defense counsel failed to recognize that the Government's evidence failed to establish the evidence necessary to support the convictions on Counts 11 and 12. This is so because the count as alleged required the Government to establish that decedent died of an Oxycontin overdose and a Roxycodone overdose. However, the Government's expert testified that decedent died of an oxycodone overdose, and she could not opine whether the source was Oxycontin or Roxycodone. 3) Trial counsel failed to seek an instruction on single vs. multiple conspiracies. 4) Trial counsel failed to object to jury instructions that shifted the burden onto him to establish his own good faith defense.

(Petition ¶ 12.) Respondent disputes each one of these claims.

## IV.    DISCUSSION AND ANALYSIS

### A.    *Motion to Expand the Record*

As a preliminary matter, Movant has moved to expand the record in the case, pursuant to Rule 7 governing proceedings under § 2255 in his efforts to more fully develop his motion. The

Court may expand the record in a § 2255 proceeding to include letters, documents and affidavits. *Raines v. United States,* 423 F.2d 526, 529-30 (4th Cir. 1970).

In his motion, Movant asks that the Court consider the following materials:

(1)     Exhibit 1: Affidavit of Harry J. Bonnell In Support Of Ronald McIver's § 2255 Petition, dated 04/28/08;

(2)     Exhibit 2: Affidavit of Harold E. Schueler In Support Of Ronald McIver's § 2255 Petition, dated 05/06/08;

(3)     Exhibit 3: Affidavit of Marie Frisof In Support of Ronald McIver's § 2255 Petition, dated 05/07/08;

(4)     Exhibit 4: Jerrold B. Leikin & William A. Watson, "Post-mortem Toxicology: What the Dead Can and Cannot Tell Us," Journal of Toxicology, Vol. 41., No. 1 (2003);

(5)     Exhibit 5: Richard W. Prouty & William H. Anderson, "The Forensic Science Implications of Site and Temporal Influences on Postmortem Blood-Drug Concentrations," Journal of Forensic Sciences, Vol. 35, No. 2 (March 1990);

(6)     Exhibit 6: Olaf H. Drummer, "Post-mortem Toxicology," Forensic Science International, No. 165 (2007);

(7)     Exhibit 7: M. Dalpe-Scott et al., "A Comparison of Drug Concentrations in Postmortem Cardiac and Peripheral Blood in 320 Cases," Canadian Society of Forensic Science Journal, Vol. 28, No. 2 (1995);

(8)     Exhibit 8: Anne-Laure Pélissier-Alicot et al., "Mechanisms Underlying Postmortem Redistribution of Drugs: A Review," Journal of Analytical Toxicology, Vol. 27 (Nov./Dec. 2003);

(9)     Exhibit 9: Randall Baselt, *Disposition of Toxic Drugs and Chemicals in Man* (6th ed. 2002) (excerpt);

9

(10)   Exhibit 10: Steven B. Karch, *Karch's Pathology of Drug Abuse* (3d ed. 2002) (excerpt);

(11)   Exhibit 11: Transcript of Dr. Demetra Garvin's deposition in a related civil action approximately twenty-one months after the end of the criminal trial. The deposition dealt with    issues identical to those regarding which she testified at the criminal trial. Namely, her deposition testimony relates to the toxicology issues concerning the death of Mr. Larry Shealy; and

(12)   Exhibit 12: Toxicology Report Prepared by American Institute of Toxicology.

Respondent has no objection to the affidavits of Harry J. Bonnell, Harold E. Schueler, and Marie Frisof (Exs. 1, 2, and 3, respectively) of Movant's § 2255 motion.  (Respt.'s Answer 2.)  But it argues that the remaining materials listed above "are beyond the purview [of] the issue[s] raised, are cumulative and superfluous, and will not aid the court in deciding the ultimate question relating to [Movant's] trial counsel's effectiveness.  Accordingly, [Respondent] does not consent to expanding the record with the articles, laboratory report, and deposition." *Id.*  Having reviewed the materials, however, the Court finds them to be helpful in its consideration of the claims raised in Movant's § 2255 motion.  Therefore, the Court will grant Movant's motion to expand the record.

B.     *Ineffective Assistance of Counsel*

As already stated, the only ground that Movant propounds in his § 2255 motion is ineffective assistance of counsel.  The standard governing ineffective assistance of counsel claims is found in *Strickland v. Washington,* 466 U.S. 668 (1984).  To succeed on such a claim, Movant must first show that his counsel's performance was "deficient," *Strickland,* 466 U.S. at 687, and that such deficiency resulted in actual prejudice to Movant.  *Id.*

As to the first prong of the *Strickland* test, an attorney's conduct is deficient if it fails to meet a standard of "reasonably effective assistance." *Id.*  The question whether counsel's performance was deficient may be answered only by viewing counsel's actions or decisions in the light of all

10

surrounding circumstances at the time the decision was made, not in the artificial light of hindsight. *See Lockhart v. Fretwell,* 506 U.S. 364, 371-72 (1993).

In addition to showing ineffective representation, Movant must also demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. In attempting to establish ineffective assistance of counsel, Movant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, as this Court applies a "heavy measure of deference to counsel's judgments," *id.* at 691.

With this standard in mind, the Court will now address each of Movant's claims of ineffective assistance of counsel in turn.

### 1.     Failure to investigate the actual cause of Shealy's death

First, Movant maintains that Counsel was ineffective in his failure to investigate Shealy's death. On the expanded record now before it, the Court agrees.

As to this claim, Movant contends that trial counsel failed to make a reasonable investigation that would have (1) revealed that Shealy likely died of heart disease, (2) revealed that Shealy showed no signs of having died from an opioid overdose, (3) revealed that post-mortem redistribution distorted the toxicology results and prejudiced Movant, and (4) established that the laboratory's margin of error rendered the toxicological evidence virtually meaningless.

The Court finds arguments one and three most persuasive. Thus, inasmuch as those two arguments are enough to demonstrate trial counsel's ineffectiveness, and the prejudice to Movant that resulted, the Court need not discuss the remaining arguments here.

On the issue of whether a reasonable investigation would have revealed that Shealy likely died of heart disease, Movant submitted the affidavit of Harry J. Bonnell, a forensic pathologist consultant. Bonnell's affidavit states, in relevant part, the following:

> 11.    Mr. Shealy's autopsy revealed that his heart was severely diseased. He had a 90% blockage of one of his coronary arteries (the left anterior descending branch) and 50 % blockage of another (the left circumflex). The blockage in the left anterior descending branch would have severely compromised the heart's "electrical system." Mr. Shealy's cardiac condition was so serious that, if made known of it, no responsible physician would have ever permitted Mr. Shealy to leave the hospital. Instead, any competent physician would have immediately recommended an immediate emergency procedure to prevent a heart attack. The recommended procedure would likely have been angioplasty and the insertion of a stent. If that procedure failed, the physician would have recommended a bypass procedure. At the time of his death, Mr. Shealy's heart was so severely damaged that even relatively low-impact forms of exercise, such as mowing the lawn, jogging a single block, or even taking a stress test in a doctor's office, would have created a substantial risk of a fatal heart attack.

> 12.    Further corroboration of the severity of Shealy's heart disease is the finding of a previous heart attack, manifested by the scarring of the heart muscle.

> 13.    In addition to these severe blockages, Mr. Shealy's heart was also dangerously enlarged. An enlarged heart is most commonly caused by hypertension. The pathology report lists its weight at 502 grams. Given Mr. Shealy's age (56 years) and weight (189-190 pounds), a heart this large should immediately have led Dr. Ross [the government's forensic pathologist] to focus on heart disease as a possible or even likely cause of death. In my experience, any heart in excess of 350 to 400 grams found in a patient fitting Mr. Shealy's profile is a strong indicator of heart failure as being the cause of death, as it is undisputed that an enlarged heart makes a patient very susceptible to sudden arrhythmia and death.

> 14.    Mr. Shealy also manifested a second unambiguous sign of heart disease: chronic passive congestion, most commonly caused by congestive heart failure. When a heart is diseased to the degree that it does not pump efficiently, it creates what is known as back pressure on the "reload" side of the heart. This pressure in turn leads to enlargement of the liver and spleen.

15.    In Mr. Shealy's case, the autopsy report indicated that Mr. Shealy's liver and spleen were severely enlarged. A normal sized liver for a man of Mr. Shealy's size would have been between 1400 to 1500 grams; a normal sized spleen for Mr. Shealy would have been between 80 to 100 grams. Mr. Shealy's liver was 2380 grams--50% larger than normal--and his spleen was 270 grams--300% larger than normal. The fact that these organs were enlarged provided clear evidence that Mr. Shealy was suffering from chronic congestive heart failure and was suffering from advanced heart disease. Nonetheless, Dr. Ross appears not to have recognized that these findings were highly suggestive that the cause of death in this case was actually a heart attack.

16.    Under these circumstances, a microscopic examination of the coronary arteries should have been conducted. Such an examination if conducted, would have been able to conclusively determine whether or not Mr. Shealy had in fact died of a heart attack. This examination of the coronary artery, if it were done, would have established the presence or absence of inflammatory changes in the wall of the coronary artery. The presence of inflammation would have indicated progressive, advancing disease. The absence of such inflammation is indicative of a static situation, meaning that the disease is present but not active. In my experience, the decision to conduct such an examination under these circumstances should have been automatic. It is, in my view, simply inexplicable that no such examination was done in this case. This test could have conclusively determined whether Mr. Shealy died of a heart attack. Nevertheless, given all of the evidence in this case, the most obvious cause of death is heart attack.

17.    My opinion regarding Mr. Shealy's cause of death is not based on "cutting edge" scientific opinion, but, rather, are basic observations that should have been made by any competent pathologist, had one been consulted by trial counsel.

(Aff. of Harry J. Bonnell, M.D. ¶¶ 11-17.) The Court finds this evidence very compelling.

In response, Respondent does not dispute the evidence of Movant in any way. Instead, it points out that trial counsel did bring into question the testimony of the government's forensic pathologist, Dr. Ross, about other causes of Shealy's death. For instance, Respondent reminds the Court that trial counsel educed from Dr. Ross that Shealy had "congestive heart failure" (Tr. 408) and "pulmonary congestion," both that could be lethal. (Tr. 412-13.)

But this, without more, is simply insufficient to overcome Movant's claim of ineffective assistance of counsel as to this claim. And not only was it ineffective for trial counsel not to investigate more fully whether Shealy most likely died of heart disease, as opposed to a drug overdose, but Movant was also greatly prejudiced as a result.

Moreover, Movant's trial counsel was also ineffective in his failure to investigate the question of whether post-mortem redistribution distorted the toxicology results and prejudiced Movant. On this issue, Movant has put forth the affidavit of forensic pathologist Dr. Bonnell and Dr. Harold E. Schueler, currently the Chief Toxicologist at the Froward County Medical Examiner's Office in Fort Lauderdale, Florida.

In his affidavit on this claim, Dr. Bonnell states, in relevant part, the following:

> 18.     When an individual dies, many drugs-including oxycodone-will move from their location prior to death ("ante-mortem") and move toward organs known as "drug reservoirs." The heart is such a reservoir. When drugs are contained in the stomach at the time of death, the drugs rapidly move through blood vessels back toward the heart, concentrating in the right and left cardiac chambers, the aorta and, most important here, the inferior vena cava. This phenomena is known as Post Mortem Redistribution (or sometimes Post Mortem Release) or ("PMR"); and has been documented and widely written about in scientific literature for at least the past 20 years. There is no dispute or question in the scientific community that this phenomenon exists, or that it must be accounted for whenever one attempts to identify the amount of drugs consumed by a decedent before his or her death. The effects of PMR begin very shortly after death, certainly within hours. Given the length of time between Mr. Shealy's death and autopsy in this case--nine and one-half hours, according to the autopsy report which stated time of death at 3:30 a.m. and time of autopsy at 1:00 p.m.--there is no question in my mind that PMR would have affected the concentration of oxycodone in the sample measured.

> 19.     In order to account for PMR, the proper and accepted manner of taking blood samples from a decedent is to take the blood sample from what is known as a "peripheral drug site." A peripheral drug site is from the decedent's extremities, ideally from the femoral vein (in the leg). It has been well-established that only by taking blood samples from a peripheral drug site can one have any degree of

confidence in the accuracy of a toxicological screen in a. decedent. A failure to take blood from a peripheral site will, in the case of opioids and many other drugs, result in a misleadingly high toxicological reading. This is because very shortly after death, the opioid drugs in the system will migrate to the area of the heart. It is well-established that PMR begins shortly after death. In this case, where the autopsy occurred nine and one-half hours after Mr. Shealy's death, there is no question but that PMR would have been well underway at the time of the autopsy.

20.     In her deposition on January 16, 2007, Dr. Garvin [the government's forensic toxicologist] testified that Mr. Shealy's blood was taken from the inferior vena cava, a location she termed a peripheral site. Garvin Tr. at 109:514. Dr. Garvin is simply wrong; the inferior vena cava is not a peripheral site; it is a central site. *See* Anne-Laure Pelissier-Alicot *et al.,* "Mechanisms Underlying Postmortem Redistribution of Drugs: A Review," Journal of Analytical Toxicology, Vol. 27, Nov./Dee. 2003, p. 533 (listing the inferior vena cava as a central site to which drug molecules "rapidly diffuse" during PMR). Because Mr. Shealy's blood sample was taken from a central site such as the inferior vena cava, there is no question that PMR would have significantly affected the toxicological result. There is also no question that the toxicological result in this case reflected a significantly higher reading than it would have had the blood sample been taken properly, i.e., from a peripheral site.

21.     There was no justification in this case for the failure to collect a sample from a peripheral site. Mr. Shealy did not "bleed out," which would have made such collection difficult if not impossible. In any event, regardless of *why* a peripheral site was not used, the fact is that, using a central site for Mr. Shealy's blood sample renders the toxicological result meaningless in this context. Specifically, the failure renders meaningless the conclusion that Mr. Shealy's blood contained a concentration of 404 ng/mL of oxycodone.

22.     Because of the issue of PMR, the conclusion that Mr. Shealy had a concentration of 404 ng/mL of oxycodone in his bloodstream at the time of death is simply without any scientific basis. There can be no question but that the toxicologist's finding significantly overestimated the actual amount of oxycodone that was actually present in the blood prior to Mr. Shealy's death.

23.     The significance of this error cannot be overstated. Dr. Garvin testified that the concentration of oxycodone in Mr. Shealy's blood at the time of death was 404 nanograms. She testified further that there was scientific literature that stated that death can result

from as little as 400 ng/mL. As a result of the incorrect blood-collection procedure, the resulting analysis and testimony was doomed to be defective from the start. A fair reading of Dr. Garvin's testimony indicates that the jury was left with the uncontroverted impression that the oxycodone concentration in Mr. Shealy's blood at the time of his death was in a potentially lethal range, when, in fact, such was not the case.

24.     As with the heart disease issue discussed earlier, the crucial impact of PMR is common knowledge among forensic pathologists. Indeed, the protocol of taking blood from a peripheral site, in order to guard against artificially high toxicology readings that result from PMR, has been in place for at least two decades. These fundamental errors would have been explained by virtually any competent toxicologist or forensic pathologist, had trial counsel consulted with one.

(Aff. of Harry J. Bonnell, M.D., ¶¶ 18-24.) Dr. Schueler's affidavit generally offers the same opinion. (Aff. of Harold E. Schueler, Ph.D., ¶¶ 10-14.) The Respondent offers nothing to dispute this evidence. In fact, it hardly addresses the argument at all, except to say that trial counsel "was unfamiliar with the post-mortem redistribution of <u>drugs</u>." (Respt.'s Answer 15) (emphasis in original).

The Court finds Movant's evidence to overwhelmingly demonstrate that Movant's trial counsel was ineffective in his failure to make a reasonable investigation as to whether post-mortem redistribution distorted the toxicology results on Shealy. Such failure was prejudicial to Movant.

In sum, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Here, trial counsel for Movant had a duty to fully investigate the actual cause of Shealy's death. In that he failed to do so, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Id.* at 694, the Court will grant Movant's § 2255 motion as to Counts 11 and 12.

### 2. Insufficiency of the evidence--Counts 11 and 12

Second, Movant avers that trial counsel was ineffective in his failure to recognize and argue that the evidence presented at trial was insufficient to support Movant's convictions as to Counts 11 and 12. In light of the Court's discussion above, the Court need not address this claim here. The Court notes, however, that the Court of Appeals has already determined that the evidence at trial was "sufficient to support [Movant's] conviction on Counts 11 and 12." *McIver*, 470 F.3d at 565.

### 3. Jury charges regarding single vs. multiple conspiracies

Third, Movant contends that his counsel provided ineffective assistance of counsel by not requesting a jury instruction regarding single conspiracy versus multiple conspiracies. The Court is unpersuaded.

"The essential elements of a § 846 conspiracy are (1) an agreement between two or more persons to undertake conduct that would violate the laws of the United States relating to controlled substances and (2) the defendant's wilful joinder in that agreement." *United States v. Clark*, 928 F.2d 639, 641-42 (4th Cir. 1991). The Fourth Circuit affirmed Movant's conviction on this count. *McIver,* 470 F.3d at 565.

Upon request, the trial court should instruct the jury on single versus multiple conspiracies if there is an evidentiary basis to support it. *See, e.g.*, *United States v. Dorta*, 783 F.2d 1179, 1183-84 (4th Cir. 1986); *United States v. Hines*, 717 F.2d 1481, 1490 (4th Cir. 1983). However, "[a] multiple conspiracy instruction is not required unless the proof at trial demonstrates . . . separate conspiracies *unrelated* to the overall conspiracy charged in the indictment." *United States v. Kennedy*, 32 F.3d 876, 884 (4th Cir. 1994) (emphasis in original) (citation and quotation marks omitted).

In the case at bar, the Court gave the following instructions regarding single versus multiple conspiracies:

> Whether the government has proven a single or multiple conspiracy is a question of fact for the jury. A single conspiracy can be found in a case involving multiple transactions where there is an overlap of key actors, methods and goals indicating one overall agreement or one general business venture. However, a particular co-conspirator need not be involved in every phase of the conspiracy to be deemed a participant in a single ongoing conspiracy.

(Tr. 1224:18-25.)

"If a single conspiracy is proved, a defendant need not be involved in every phase of that conspiracy to be deemed a participant." *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988). Once a conspiracy has been proved, "the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992) (citation omitted). Indeed, a defendant need not have knowledge of all his co-conspirators, or of all of the details of the conspiracy, and he may be convicted despite having played only a minor role. *Id.* (citations omitted).

Contrary to Movant's contentions otherwise, the evidence at trial demonstrated that there was a single conspiracy here, not multiple ones. Moreover, "[t]here was no danger that the jury might impute someone else's guilt to [Movant]. All the evidence related to him." *United States v. Carr*, No. 91-5047, 1992 WL 140308, at *2 (4th Cir. July 7, 1992). Thus, the Court is unable to find that Movant's trial counsel provided ineffective assistance as to this claim.

### 4. *Jury instructions regarding mens rea and "good faith"*

Fourth, Movant argues that his counsel at trial was ineffective in neglecting to research and object to the Court's allegedly unconstitutional jury instructions regarding the drug diversion counts. Movant states two bases for why he thinks that the jury instructions were constitutionally infirm:

18

First, Movant insists that the relevant statute, 21 U.S.C. § 841(a)(1), has a mens rea requirement such that the distribution must be purposefully illegitimate. And second, he protests that the instructions shifted the burden to Movant in the "good faith" portion of the charge. The Court disagrees.

"Under § 841(a)(1), the government must prove (1) that [Movant] knowingly or intentionally distributed a controlled substance; (2) with knowledge that it was controlled under the law; and (3) that he did so outside the usual course of professional practice." *McIver*, 470 F.3d at 556 (citations and quotation marks omitted). Whether or not there is a mens rea requirement, the Court is of the opinion that the instructions at issue directed the jury that to convict Movant on this charge, the jury had to find intent. The jury charges state, in relevant part, the following:

> For you to find that the government has proven this essential element you must determine that the government has proven beyond a reasonable doubt that the defendant was acting outside the bounds of professional medical practice as his authority to prescribe controlled substances was used not for treatment of a patient, but for – but *for the purpose of* assisting another in the maintenance of a drug habit or dispensing controlled substances for other than a legitimate medical purpose, in other words, personal profit of the physician.

(Tr. 1219:17-1220:1 (emphasis added).) Thus, the Court finds this portion of the claim to be without merit.

Movant's contention that the "good faith" jury instructions improperly shifted the burden to Movant is equally unavailing.

As to the good faith portion of the jury charge, the Court instructed the jury as follows:

> If a doctor dispenses a drug in good faith in medically treating a patient, then the doctor has dispensed that drug for a legitimate medical purpose in the usual course of medical practice. That is he has dispensed the drug lawfully.
>
> Good faith in this context means good intentions and the honest exercise of professional judgment as to the patient's needs. It means

19

that the defendant acted in accordance with what he reasonably believed to be proper medical practice. If you find that the defendant acted in good faith in dispensing the drugs charged in the indictment, you must find the defendant not guilty.

*For you to find that the government has proven this essential element you must determine that the government has proven beyond a reasonable doubt* that the defendant was acting outside the bounds of professional medical practice as his authority to prescribe controlled substances was used not for treatment of a patient, but for -- but *for the purpose of* assisting another in the maintenance of a drug habit or dispensing controlled substances for other than a legitimate medical purpose, in other words, personal profit of the physician.

Put another way, *the government must prove as to each count beyond a reasonable doubt* that the defendant dispensed the specific controlled substance for other than--*other than for a legitimate medical purpose* and not within the bounds of professional medical practice.

A physician's own methods do not themselves establish what constitutes medical practice.

(Tr. 1219:6-1220:8) (emphases added).

In this portion of Movant's argument, he contends that "[t]he Court should have instructed the jury that the government must prove beyond a reasonable doubt that [Movant] intended to prescribe the drugs for an illegitimate purpose." (Movant's Mem. 44.) The Court agrees. And that is exactly what it did.

The Court has already discussed the intent portion of this argument above. As to whether the Court required the "beyond a reasonable doubt" standard, after reviewing the Court's instructions as a whole, the Fourth Circuit opined that the Court "cabined both its overall § 841(a)(1) instruction, as well as its specific instructions on the third element, within the requirement of proof beyond a reasonable doubt." *McIver*, 470 F.3d at 559 (citation and quotation marks omitted).

The *McIver* court then went on to observe that,

in order to satisfy this definition of unlawful conduct, the district court required the prosecution to prove, not only that [Movant] acted "outside the course of professional practice," . . . but also that he acted *for other than a legitimate medical purpose.* This additional requirement arguably benefitted [Movant] by placing an even heavier

       burden on the government than otherwise required to establish
       criminal liability.

*Id*. (emphasis in original) (citations and quotation marks omitted). "[T]he court next stated that so long as [Movant] acted in good faith, he acted lawfully." *Id.* The reviewing court then summed up its discussion about the jury charges by stating, "We therefore find no error with the district court's instructions." *Id*. at 560.

    In that the jury charges are legally correct, it is of no moment as to whether Movant says, with the benefit of twenty-twenty hindsight, that his counsel should have investigated and objected to the allegedly erroneous jury instructions, or that the instructions could have been more clearly drafted. Simply stated, Movant was not prejudiced by counsel's alleged ineffectiveness. Consequently, the Court will deny Movant's jury charge claim.

       *5.*  *Other arguments*

    Although not specifically addressed, the Court has carefully considered Movant's remaining arguments but need not address them herein, either because the Court's other holdings on a particular claim are dispositive or because Movant's contentions are so lacking in merit so as not to necessitate discussion.

## V.  CONCLUSION

    Wherefore, based on the foregoing discussion and analysis, it is the judgment of this Court that Movant's motion to expand the record pursuant to Rule 7 is hereby **GRANTED** and his § 2255 motion to vacate is **GRANTED IN PART**, and **DENIED IN PART**. Consequently, the Court's judgment as to Counts 11 and 12 is **VACATED**. Moreover, because the Court will now need to determine the relevant drug weights, the Court's sentence is hereby **VACATED**.

Counsel for both parties shall consult forthwith and then, within ten days of the filing of this Order, submit to the Court a proposed scheduling order as to any subsequent trial and/or sentencing hearing in this case.

The governing law applicable to certificates of appeals provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).

A movant satisfies this standard by demonstrating that reasonable jurists would find this Court's assessment of his constitutional claims is debatable or wrong and that any dispositive procedural ruling by this Court is debatable. *See Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003); *Slack v. McDaniel,* 529 U.S. 473, 484 (2000); *Rose v. Lee,* 252 F.3d 676, 683 (4th Cir. 2001). In the case at bar, the legal standard for the issuance of a certificate of appealability has not been met. Therefore, to the extent that a certificate of appealability is requested, the request is hereby **DENIED.**

**IT IS SO ORDERED**.

Signed this 28th day May, 2010, in Spartanburg, South Carolina.

s/ Henry F. Floyd
HENRY F. FLOYD
UNITED STATES DISTRICT JUDGE