1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF SOUTH CAROLINA
2           ANDERSON/GREENWOOD DIVISION

3

   UNITED STATES OF AMERICA          )
4                                    )
           -versus-                  )
5                                    )
   RONALD A. MCIVER                  )  8:04-745
6                                    )
                 Defendant           )  10/06/2010
7                                    )
                                     )  Spartanburg, SC
8    _____)

9
                        SENTENCING
10

11        BEFORE THE HONORABLE HENRY F. FLOYD
          UNITED STATES DISTRICT JUDGE, presiding
12

13
     A P P E A R A N C E S:
14

     For the Government:        WILLIAM J. WATKINS, JR., AUSA
15                              U.S. Attorney's Office
                                105 N. Spring Street
16                              Greenville, SC 29601

17
     For the Defendant:         PETER R. ZEIDENBERG, ESQ.
18                              MITKA T. BAKER, ESQ.
                                DLA Piper US LLP
19                              5000 8th Street, NW
                                Washington, DC 20004
20
                                STEVEN E. BUCKINGHAM, ESQ.
21                              Nelson Mullins riley Scarborough
                                104 South Main Street
22                              Greenville, Sc 29601

23   Court Reporter:            Jean L. Cole, RMR
                                U.S. District Court Reporter
24                              PO Box 10732
                                Greenville, SC  29603
25   The proceedings were taken by mechanical stenography and the
     transcript produced by computer.

2

1          THE COURT:  Mr. Watkins.

2          MR. WATKINS:  Good afternoon, your Honor.

3          THE COURT:  Ready to proceed?

4          MR. WATKINS:  Government is ready, sir.

5          THE COURT:  All right.  Mr. Zeidenberg, you ready?

6          MR. ZEIDENBERG:  Good afternoon, your Honor.  Yes, we

7    are.

8          THE COURT:  All right.  Does he want to remain seated

9    or can he come up here and stand?

10          MR. ZEIDENBERG:  I'm sorry?

11          THE COURT:  Does he want to remain seated over there

12    or does he want to come up here and stand?

13          MR. ZEIDENBERG:  Yes, your Honor.

14          THE COURT:  Which one?

15          MR. ZEIDENBERG:  I'm sorry.  Seated.  Remain seated.

16          THE COURT:  All right.  You need to put the mic over

17    there where he. . .

18          All right.  Mr. McIver, have you had an opportunity

19    to go over the presentence report with your lawyers?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  Other than the objection do you have any

22    question about it?

23          THE DEFENDANT:  No, sir.

24          THE COURT:  Mr. Zeidenberg, have you -- you've

25    obviously read the report and discussed it with your client?

3

1          MR. ZEIDENBERG:  Yes, your Honor.

2          THE COURT:  Mr. McIver, when you started out, as of

3   now as a result of the 2255 the statutory provisions call for

4   as to counts 1, 3, 4, 5, 13, 14 and 15, 20 years on each count;

5   supervised release on counts 1, 3, 4, 5, 13, 14 and 15 at least

6   two years, but not more than three years for each count; not

7   eligible for probation.  The fine on each of those counts is

8   one million dollars each for a total of seven million dollars,

9   special assessment $100 for each count for a total of $700.

10          When they did the guideline provisions, your total

11   offense level came back at 32, your criminal history

12   category I, ineligible for probation, an advisory guideline

13   range of 121 to 151 months, three years supervised release.

14   Fine and restitution were either not calculated or not

15   applicable and a $700 special assessment fee.

16          Do you understand that's what the --

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  -- guidelines call for?

19          There was an objection by the defense, but none by

20   the government.  Mr. Zeidenberg, I'll be glad to hear from you

21   on your objection.

22          MR. ZEIDENBERG:  Thank you, your Honor.  Your Honor,

23   the government submitted in their verdict form drug weights for

24   the jury to make specific findings and on the counts for which

25   there were convictions we've -- it's not controversial and not

4

1    controverted how that calculation is done.  You take the

2    weights that are found by the jury and multiply them as

3    designated by the sentencing guidelines and when you do that,

4    you come up with a level 26 once you convert everything to

5    marijuana.

6            Now, the presentence report writer did a different

7    calculation.  He calculated the entire weight of the pill for

8    the non-oxycodone drugs, but there is no evidence of how he

9    calculated that.  In his letter responding to the government --

10   I'm sorry, responding to the defense's objections, the

11   probation -- the presentence report writer says that he will

12   file detailed findings outlining how he came to those

13   calculations.  He hasn't done that.

14           He alludes in his response that he had some

15   conversations with the prosecutor and a case agent.  We don't

16   know anything about those conversations, your Honor.  We don't

17   know what was said.  We don't know what he's relying on.  There

18   are no lab reports that have been provided to us.  There are no

19   notes.  There's no lab notes.  There is simply no evidence by

20   which your Honor can find, as you must, by a preponderance of

21   the evidence that these drug weights that the presentence

22   report writer indicates are appropriate are -- there's any

23   basis for them.  So I don't think the court has any alternative

24   but to find the weights as found by the jury, because that's

25   the only thing that's the only evidence that's before the

5

1    court.

2            THE COURT:  Mr. Watkins.

3            MR. WATKINS:  May it please the court, your Honor.

4    The government disagrees with the defense's proposed

5    calculation for the following reasons:  First, and I think the

6    presentence writer, Mr. Wood, laid this out clearly, but for --

7    according to the guidelines and according to the cases for

8    oxycodone you take the actual amount of that drug in the pill,

9    not the entire weight of the pill.  That is laid out in the

10   guidelines.  For the other substances at issue in this case,

11   for example, morphine Dilaudid, the guidelines are clear that

12   you treat that as a mixture and for the -- for calculation

13   purposes you take the weight of the entire pill, not the amount

14   of the drug within the pill.

15           And, your Honor, I would like to hand up to the

16   court, and I have a copy for opposing counsel, two cases that

17   really lay this out clearly, one from our own Fourth Circuit

18   Court of Appeals and another from the Ninth Circuit Court of

19   appeals that have rejected arguments that are being made in

20   this court today.

21           In those two cases I'm handing up the issue was

22   specifically Dilaudid, which was just one of the substances at

23   issue in this case, but the guidelines clearly provide -- and

24   I'm looking -- beg the court's indulgence, note (a) under

25   2D1.1, "Unless otherwise specified the weight of a controlled

6

1    substance set forth in the table refers to the entire weight of

2    any mixture or substance containing a detectable amount of the

3    controlled substance."

4            But under the definitions under Section (b) the term

5    "oxycodone actual" refers to the weight of the controlled

6    substance itself contained in the pill or capsule, so oxycodone

7    is treated differently than the other substances.  That's what

8    the guideline provides for.

9            As for where the probation officer came up with the

10   weights, I believe the court would ask him or we can put the

11   case agent up, that the pill weights came from a DEA index

12   where obviously the DEA regulates drug manufacturers of

13   controlled substances in the United States.  They periodically

14   receive actual pills, dosage units from those manufacturers,

15   regulate them, review them, weigh them and that's where the

16   weights came from.

17           And I'm also informed from the case agent and I would

18   be happy to call him, that whenever there was an issue, for

19   example, if -- could say a generic could have been prescribed

20   and we don't know the exact weight of the pill, the number used

21   was the lowest possible weight of any pill of that type.

22   Therefore, your Honor, the government believes that in

23   accordance with the case law, the guidelines, that the drug

24   amount is properly calculated and is accurate and your Honor

25   should so find by the appropriate standard.

ADAM ROBERSON - DIRECT

7

1          THE COURT:  I think you better take some testimony.

2          MR. WATKINS:  Yes, sir.  All right.  Your Honor, I

3   would be happy to call first Agent Roberson.

4          Adam ROBERSON, Government's witness, sworn

5            DIRECT EXAMINATION BY MR. WATKINS

6   Q.    Please state your full name for the record.

7   A.    My name is Adam Roberson.

8   Q.    Agent Roberson, where do you work?

9   A.    I'm a diversion investigator.  I work for the Drug

10  Enforcement Administration in Columbia, South Carolina.  I'm

11  the senior investigator for the state.

12  Q.    How long have you been with DEA?

13  A.    I've been with DEA for 11 years as a diversion

14  investigator.  I was a police officer in South Carolina for 11

15  years prior to that, totalling 22 years in law enforcement.

16  Q.    Okay.  Are you familiar with the DEA logo index?

17  A.    I am.  Part of my responsibilities as a diversion

18  investigator in addition to enforcing the Controlled Substance

19  Act as it relates to the diversion of legitimate

20  pharmaceuticals is to regulate and inspect manufacturers and

21  handlers of those drugs.  In the case on point here

22  manufacturers of controlled substances in this state and abroad

23  throughout the U.S. are required when inspected by DEA to

24  provide ballistic samples of any controlled substance

25  manufactured through their licensure with DEA.

ADAM ROBERSON - DIRECT

8

1  Q.    Now, what do you mean by ballistic samples?

2  A.    We take samples of any run of any manufacturer of any

3  controlled substance.  Those samples are recovered by diversion

4  investigators.  They are transferred to our special testing

5  laboratory in Dulles, Virginia where they're maintained and

6  cataloged for inspection visual, compared to any clandestine

7  ones we may find on the street.  They're also cataloged by

8  weight.  Those weights and logos of what the pills look like

9  and have on the score are maintained in an index which is an

10  in-house computer systems used by diversion investigators to

11  identify pharmaceuticals.  By doing so we have all controlled

12  substances legitimately manufactured in the U.S. in this index

13  by weight, color, size and shape.

14  Q.    Okay.  Explain to the court how you used this index and

15  what you did in assisting with the drug calculations in this

16  case.

17  A.    In this case if a drug was noted in a prescription order

18  by Dr. McIver in a brand form, for instance in this case

19  OxyContin is a brand, very specific.  It's a brand name of an

20  oxycodone product, but there's only one manufacturer of

21  OxyContin, then I take the name and the weight as prescribed,

22  the strength, for instance, OxyContin 80 milligram there's only

23  one manufacturer and one weight of the brand.  I take that,

24  compare it to our logo index which has a ballistic weight of

25  that tablet as provided by the manufacturer to be within their

ADAM ROBERSON - DIRECT

9

1    parameters.

2            Also methadone, Dilaudid, in this case we got

3    morphine sulphate, MSIR.  There are other different

4    manufacturers of morphine sulphate, so in this case because

5    there are multiple ballistic samples and there are other types

6    of generics, because I don't know, nor does the defendant know

7    how the pharmacy may have filled that prescription, I was

8    required to take the lowest recorded U.S. manufactured drug

9    weight for that type of a drug.  So in this case in that regard

10   morphine sulphate was a 100 milligram tablet.  Although there

11   are much bigger ones I used lowest possible recorded weight in

12   the U.S.

13   Q.    Do I understand you for a drug containing morphine

14   sulphate you used the lowest possible total weight a tablet

15   could be with that milligram dosage?

16   A.    Yes, sir.

17   Q.    And did you repeat that process for other controlled

18   substances at issue where you did not know what exactly the

19   pharmacy had dispensed insofar as the brand?

20   A.    In this case unless it was a brand any generic -- and

21   most of the drugs in this case were brand, they were written

22   for Roxicodone, which is a brand of oxycodone or OxyContin,

23   which is a brand for oxycodone, but if there was a generic on

24   the prescription, I used the lowest possible calculated

25   recorded weight in our inventory.

ADAM ROBERSON - DIRECT

10

1    Q.    Okay.  And you -- where did you get the milligram weights

2    from in your research to then go look in the DEA logo index?

3    A.    Based on the documents provided in the case recovered

4    through search warrants or prescriptions, so if the

5    prescription written by Dr. McIver to a patient for MSIR

6    15 milligrams or whatever the drug may be, I would take the

7    drug, morphine sulphate 15-milligram strength, and I'd look in

8    that logo index for the lightest weight because there are

9    options, so I took the lightest weight based on his handwritten

10   order of what the minimal would be, minimal weight of morphine.

11   Q.    And did you provide these weights to the United States

12   probation officer?

13   A.    I did.  It's common practice in a case like this for us

14   to confer with probation and I did speak with Mr. Woods in this

15   case related to exactly what we're talking about, the weights

16   of the tablets and how they applied in this case.

17   Q.    Did you receive any calls from defense counsel regarding

18   weights?

19   A.    Not at all.

20   Q.    Would you have answered their questions had they called

21   you?

22   A.    Absolutely.  Commonly happens in cases like this.

23   Q.    Okay.  Are you familiar with the calculation of drug

24   amounts once the weight of the pill is determined?

25   A.    I am.

ADAM ROBERSON - DIRECT

11

1   Q.    And could you explain your understanding of that based on

2   your experience.

3   A.    In this case there's two categories of drugs, oxycodone

4   products and then all the other controlled substances as it

5   relates to this case.  In relation to oxycodone products the

6   Sentencing Guideline 2D1.1 require that it's an actual weight,

7   so an OxyContin 80-milligram tablet we only use 80 milligrams.

8   The actual active ingredient in the tablet is converted to an

9   equivalent of marijuana pursuant to the guidelines.  One gram

10  of active ingredient oxycodone equals 6,700 grams of marijuana.

11  I assisted in mathematical calculation of oxycodone to

12  marijuana for probation.

13          With all the other drugs it's the physical weight of

14  the tablet based on the logo index we've spoken of.  I tallied

15  up all the numbers of tablets as written by Dr. McIver in the

16  counts in the indictment.  I totaled up those weights of how

17  much marijuana equivalent each tablet in its total weight and I

18  provided that also to probation office.

19  Q.    Okay.  And you spoke multiple times with the probation

20  office and answered any questions?

21  A.    In this case I did and on other cases out of Greenville

22  I've talked on many occasions on this topic.

23  Q.    Okay.  And the drug amounts used in this case that

24  represent the current guideline range are just those in the

25  substantive counts of the indictment, correct?

ADAM ROBERSON - CROSS

1    A.    Excluding count one it's substantive counts as convicted

2    on the jury verdict form, yes, sir.

3    Q.    And it excludes the drug amounts related to substantive

4    counts of Mr. Shealy, correct?

5    A.    No.  Mr. Shealy's drug amounts were included because my

6    understanding was that the charge related to the death of Mr.

7    Shealy was out, but the drug weights were still a conviction.

8    I may be incorrect.

9    Q.    That's what you calculated, right?

10   A.    Yes, sir.

11   Q.    But you're not aware -- you're not aware that the

12   probation officer excluded the Shealy weights even though the

13   court just reversed on the death issue?

14   A.    I'm familiar with what the Shealy weights were.  If the

15   Shealy weights are included the guideline range will not

16   change.

17            MR. WATKINS:  Okay.  Please answer any questions of

18   the court --

19            THE COURT:  Cross-examination.

20            MR. WATKINS:  -- or the defense.

21               CROSS EXAMINATION BY MR. ZEIDENBURG

22   Q.    Good afternoon.

23   A.    Sir.

24   Q.    Were you the case agent on the case --

25   A.    Yes.

ADAM ROBERSON - CROSS

13

1   Q.    -- against Dr. McIver?

2   A.    Yes.

3   Q.    And these calculations that you did, when did you do

4   them?

5   A.    I did them at my office, as I do when we get to the

6   sentencing phase of a case.

7   Q.    So when did you do these calculations you're referring

8   to?

9   A.    When?

10  Q.    When did you do these calculations.  When?

11  A.    Prior to sentencing of Dr. McIver when he was sentenced

12  sometime ago, and I've done them again since.

13  Q.    Okay.  And do you have those calculations with you?

14  A.    They're sitting on the table, yes, sir.

15          MR. ZEIDENBERG:  Okay.  And can I get a copy, your

16  Honor?

17          THE COURT:  Sure.

18          MR. WATKINS:  No objection from the government.

19          THE COURT:  How long is it going to take to copy?

20  A.    Pardon me.

21          THE COURT:  How long does it take to copy?

22  A.    It's only about five pages.  I actually wrote my

23  calculations on the verdict form based on each count.

24          THE COURT:  Okay.

25          MR. WATKINS:  Could the witness step down here just

ADAM ROBERSON - CROSS

14

1   to make sure we're getting the correct materials to copy.

2          THE COURT:  Sure.

3          MR. ZEIDENBERG:  May I continue while we're waiting

4   your Honor?

5          THE COURT:  Sir?

6          MR. ZEIDENBERG:  May I continue?

7          THE COURT:  Yes, sir.

8   BY MR. ZEIDENBERG:

9   Q.    So you provided those actual records to probation?

10  A.    No, sir.

11  Q.    Did you provide it to the government?

12  A.    I brought them with me today.  Those are notes I made in

13  preparation for today.

14  Q.    So no one's seen them?

15  A.    Correct, I've spoken --

16  Q.    I --

17  A.    I'm sorry.

18  Q.    Go ahead.  I didn't mean to cut you off.

19  A.    I've spoken with the prosecution and probation regarding

20  those numbers since I was notified of this sentencing

21  yesterday.

22  Q.    So you just found out about the sentencing yesterday?

23  A.    Yes, sir.

24  Q.    You indicated that there's an index that you refer to?

25  A.    Yes, sir.  It's called the DEA logo index.

ADAM ROBERSON - CROSS

15

1    Q.    And do you have that with you?

2    A.    No, sir.  It's a computerized system.

3    Q.    So if we wanted, the defense wanted to check to see if

4    you were doing your calculations correctly, how would we do

5    that?

6    A.    I would have been happy to sit down with you and show you

7    the logo index or also the manufacturers of these drugs have

8    ballistic samples and standard weights they could have provided

9    as well.

10   Q.    And is there -- you ever provide your contact information

11   to the government -- I mean, to the defense?

12   A.    Yes.  I'm sure I was listed as a -- I testified in the

13   case.  I would speculate my information was listed on the

14   witness list.

15   Q.    You speculate that it was?

16   A.    I know my name was listed with my address and contact,

17   yes, sir.

18   Q.    And so all of the addition and multiplication and all the

19   mathematical equations that you did are in this paperwork

20   that's now being copied?

21   A.    These are my rough notes, but, yes, sir, it's there.

22              MR. ZEIDENBURG:  Well, your Honor, I don't have any

23   other questions of this witness.  I obviously would like to see

24   the calculations.  I mean, if I may, we can step down -- the

25   witness can step down if the court wishes.  I just have

1   argument to make to you.

2          THE COURT:  How long do you think it's going to

3   require you for you to look at the --

4          MR. ZEIDENBURG:  I don't know that it will require

5   any time.  I'd like to make an argument to you and then

6   depending on how that argument goes we could discuss, you know,

7   whether I need to review the record.

8          THE COURT:  Sure.  Go ahead.

9          MR. ZEIDENBERG:  Judge, we received the presentence

10  report in the middle of July and we had ten days in which to

11  file objections.  And on July 29th we filed our objections

12  explaining exactly why we thought these calculations were

13  incorrect.  And you have -- we have articulated it for you and

14  you see it and we reiterate those arguments in our presentence

15  report.

16          The presentence report writer got our objections and

17  he said that he will amend the PSR to show the drug

18  calculations in detail.  He stated -- and then he said later in

19  his response, "As stated earlier, this officer will insert a

20  more in-depth explanation about the conversion process for the

21  drug weight analysis in the report."

22          Now, he never provided us anything or the court as

23  far as we know.  There has been no amended PSR report.  There's

24  been no in-depth finding and then here we are walking into

25  court at 2:00 pm on the sentencing date of five weeks or

17

1    whatever.  The end of July, all of August go by, all of

2    September, so two months later we walk into court and we have a

3    case agent say, "Well, I have five pages of handwritten notes

4    which backs this up."

5              Well, it's a little late in the game.  I'm sure the

6    agent -- I take him at his word that he would have answered any

7    questions that we had for him.  I don't doubt that for a

8    second, but you put yourselves in our shoes.  How are we

9    supposed to know that we're supposed to figure out that there's

10   a DEA agent out there somewhere who's got five pages of

11   handwritten notes on which Mr. Wood is relying on to write his

12   presentence report?

13             Mr. Woods says he's going to be sending us an amended

14   report.  We were waiting and once we got that, you can bet we

15   would have poured over it carefully to see that this was done

16   correctly.  I frankly think it's somewhat of a, you know, an

17   eleventh hour type ambush when you walk into court and you're

18   handed this stuff and now we're supposed to -- supposed to

19   zealously represent Dr. McIver and make arguments to the court.

20             I don't know if these calculations are correct.  I

21   mean, again, I'm not questioning the agent's good faith for a

22   second.  I -- he got a call yesterday, I'm sure, at his office

23   and said, "Come down to Spartanburg, dig up your notes from

24   five years ago.  And we're going to -- you know, I'm going to

25   throw you on the stand and ask you some questions," but what

18

1    kind of notice is that?  What is this whole process you started

2    and it's supposed to be an orderly process where the objections

3    are noted, everyone's positions are clear on the record and

4    then we can then make an oral argument to your Honor.

5              THE COURT:  I don't think you can sit on your hands

6    and if you -- if it wasn't forthcoming, you should have either

7    contacted the court or contacted the government as to why.

8    Where is the stuff?  Now, I'll be glad to let you come back

9    another day and give you plenty of time to do the calculations

10   and check them.

11             MR. ZEIDENBERG:  Well, Judge, you know, I've got a

12   client who is dying and coming back another day, you know,

13   weeks from now or a month from now --

14             THE COURT:  No, I'm not talking -- I'm not talking

15   about weeks from now.  I'll take care of you next week.  I'll

16   take care of you tomorrow if you can to do the calculations

17   overnight.

18             MR. ZEIDENBERG:  Well, look, I'll take a look at

19   those calculations if we could have a recess.

20             THE COURT:  Sure.

21             MR. ZEIDENBURG:  And we'll take a look at them.  I

22   mean, I wanted -- you know, we wanted -- Mr. McIver's family

23   has come in.  His friends have come in and we've flown in, you

24   know, for this hearing, so obviously that's why when we get a

25   note, a response that's filed with the court saying that

19

1    there's going to be an addendum filed, I don't think it's

2    incumbent upon the defense to encourage the probation writer to

3    do his job and to do what he says he's going to do.

4            I don't know why.  Maybe he's decided that we are

5    right for all I know.  Maybe he decided that he's got other

6    things that are more important on his agenda.  I don't know.

7    But just as if -- if ten days had gone by and we hadn't filed

8    any objections to that presentence report, I don't imagine Mr.

9    Woods would have called us up and said, "You're very close to

10   your ten days, counselor.  You need to file something."

11           THE COURT:  No.  The way it works down here is if you

12   can't meet the deadline, you would ask the court for an

13   extension and you always get it.

14           MR. ZEIDENBERG:  Well, then I think it would have

15   been incumbent upon the probation reporter to say we haven't

16   met -- I can't meet the deadline.  We met our deadlines.

17           THE COURT:  We'll take a short recess and let you

18   look at the numbers.  You can make him available, both y'all

19   available.

20           (Brief recess at 2:30 pm, then reconvened at

21   2:40 pm.)

22           THE COURT:  Are we happy now?  There was an ECF

23   filing on August the 5th, 2010, contains the calculations.  The

24   amended -- it's the amended one that showed the calculations

25   beginning at paragraph 40.

20

1          MR. ZEIDENBERG:  Well, let's put it this way, Judge,

2    I wouldn't go so far as to say we're happy, but we do withdraw

3    the objection and just so the court and Mr. Woods understands

4    the issue from the gov -- keep saying the government, Judge.  I

5    was a prosecutor for many years.  It's a really hard habit to

6    break.

7          Notwithstanding that Mr. Woods did file an amended

8    presentence report, our issue with it -- and this is somewhat

9    academic just so the court understands -- is that even in this

10   one it didn't explain what the case agent just did explain,

11   which is where and how he did those calculations.  But given

12   that he has now said that, we have had an opportunity briefly

13   to sit down with him and to review his -- you know, what the

14   basis is, that there's an index and what not, that's

15   information that frankly was new to me.  I didn't know that and

16   it isn't reflected here.  So given those -- given that

17   information, we are ready to proceed with the --

18          THE COURT:  So you're withdrawing the objection?

19          MR. ZEIDENBURG:  We will, your Honor.

20          THE COURT:  All right.  Then I would adopt the

21   guideline provisions as previously stated for purposes of

22   determining the reasonableness of my sentence.  I would also

23   adopt the factual findings in the presentence report as a basis

24   in part to support the 3553(a) factors.

25          Mr. Watkins.

1          MR. WATKINS:  May it please the court, your Honor.

2     Regarding the 3553(a) factors, the government believes that a

3     guideline sentence in this case is an appropriate sentence.

4     Your Honor is very familiar with this case, but nonetheless I

5     just want to run through a couple of factors why we believe

6     that the guideline calculation as reflected and the Sentencing

7     Commission's work is appropriate.

8          First, your Honor, the nature and circumstances of

9     the offense.  As your Honor knows from your daily work in this

10    court, we have a number of pill cases that have been prosecuted

11    throughout the upstate of South Carolina.  A number of

12    individuals sadly are addicted to these painkillers and this

13    has ruined many lives.  This is a problem here in the upstate

14    of South Carolina.

15         Something that enables this illicit trade in drugs

16    are physicians like Dr. McIver, who frankly in street terms are

17    the candy man, enabling these pills to be sold by addicts,

18    passed back and forth, continuing the cycle of addiction, your

19    Honor.  This is a very serious matter to the United States and

20    the government believes that the circumstances of this offense

21    as outlined in the trial testimony and recorded in the opinion

22    of the United States Court of Appeals for the Fourth Circuit

23    are egregious.  The government believes that a guideline

24    sentence --

25         THE COURT:  Mr. Watkins --

22

1          MR. WATKINS:  Yes, sir.

2          THE COURT:  -- what do you do with the argument that

3    really Mr. McIver was convicted of will -- on the basis of

4    willful blindness and not like a pain doctor out there making

5    lots of money and selling -- and illicitly selling drugs.  In

6    other words, the guideline provision looks to me like that it's

7    designed for those people who are doing this who are -- who are

8    -- who are intentionally doing it and not willfully and blindly

9    doing it.

10          MR. WATKINS:  Your Honor, I think by turning a blind

11    eye when you have individuals coming in and simply subjectively

12    complaining of foot pain or wrist pain, no X-rays being done,

13    track marks on the arms and just prescribing massive doses of

14    the drug, that's really -- your Honor, I think when we look at

15    the totality of the drug problem, no different than someone

16    just coming in saying, "Hey, I'd like some Roxi.  I'd like a

17    little bit of oxy," and a physician prescribing.  He did a bare

18    minimum to thwart that.  So I do believe this guideline is

19    appropriate and that we have a lot of unfortunately willful

20    blindness going on in the physician community, as I -- as I

21    know your Honor has a pill sentencing again next week in a

22    conspiracy case.

23          And there's -- essentially there's two ways for these

24    conspiracies to get their pills.  One is to obtain fraudulent

25    prescriptions; two, is with the assistance of physicians like

23

1    Dr. McIver in working as the role of the candy man and putting

2    all this weight out there to be used.  Therefore, your Honor,

3    the government does not believe that the willful blindness

4    enures to his benefit.

5                THE COURT:  Well, I'm only aware of two doctors being

6    prosecuted in this district, one I think Judge Houck tried and

7    I tried the other one.  That's all I'm aware of.  There might

8    have been some others that I'm not aware of.

9                MR. WATKINS:  And, your Honor, I think that is

10   indicative that the government and DEA, we need to focus our

11   resources stopping doctors like that rather than the low-level

12   conspirators.  I would agree with that and as a prosecutor I

13   can say I'm affirmatively trying to do that in my case load.

14               THE COURT:  All right.  Go ahead with your argument.

15               MR. WATKINS:  Yes, sir.  Your Honor, we believe the

16   guideline sentence would also promote respect for our drug laws

17   and provide a just punishment for this offense.  It would also

18   deter this defendant from any further criminal conduct.  I

19   understand there's going to be an argument made for a variance

20   regarding his health and, your Honor, the Federal Bureau of

21   Prisons can certainly provide him medical care.  Butner is a

22   very fine facility and I think a guideline sentence would

23   enable him to get the care he needs.  For those factors, your

24   Honor, the government asks this court to impose a guideline

25   sentence.

24

1          THE COURT:  Well, in terms of deterring him, he

2     doesn't have a license any more, so how can he -- how can he do

3     this again?

4          MR. WATKINS:  Your Honor, it would deter him from

5     becoming involved in any sort of organization where he would be

6     involved in writing -- forging prescriptions, working with

7     these drug rings, supplying them in any way, giving them

8     information about other sources of pills.  He still could be

9     involved in criminal activity and, therefore, the government

10    still believes a guideline sentence would provide deterrence.

11         THE COURT:  Anything else?

12         MR. WATKINS:  No, sir.

13         THE COURT:  Mr. Zeidenberg.

14         MR. ZEIDENBERG:  Thank you, your Honor.  Your Honor,

15    I'm sure that the court has already read and I can tell from

16    the questions that the court has read our submission and I'm

17    sure seen the letter from Dr. Eisenberger regarding Dr.

18    McIver's health.  And as I told Dr. McIver when I sent those

19    records to this expert at Johns Hopkins, I said, "You

20    understand that bad news from Dr. Eisenberger could be

21    helpful."  But -- "to your sentencing."

22         But notwithstanding that, Judge, getting that letter

23    certainly, you know, was like a fist at the pit of your stomach

24    when you read that.  When you read the prognosis for Dr.

25    McIver, it is exceedingly grim.  The man is -- I mean, I hate

25

1   to say these things in front of him, because, you know, I can't

2   imagine hearing those words if I were sitting in his seat, but

3   the prognosis is what it is and it's extremely grim.

4            And we've included in our materials, you know,

5   probably a dozen, if not more cases in which courts have found

6   in situations where defendants had much less dire prognosis and

7   notwithstanding the statements by the Bureau of Prisons that

8   they have the facilities and they have the -- their ability to

9   treat, the guidelines specifically address this type of

10  situation and certainly you can't find a case, I don't think,

11  in which more fairly fits within 5H1.4.

12           THE COURT:  What puzzles me is about two years ago

13  you indicated to my office that you were going to the BOP to

14  apply for a mercy release.  Why didn't you do it?

15           MR. ZEIDENBERG:  Judge, you know, part of that may

16  have been our own -- you know, we may have been remiss.  We did

17  do some preliminary research.  I've got tell you in my -- and

18  this may sound self-serving.  It is almost impossible -- I'm

19  new to the defense bar.  I'm not -- you know, I don't -- you

20  know, I was a prosecutor.  I never had these issues in trying

21  to get in touch with a client who's incarcerated.  I've never

22  had a client who's incarcerated.

23           THE COURT:  Where did you prosecute?

24           MR. ZEIDENBURG:  I was a federal prosecutor in the

25  District of Columbia in the Department of Justice for 17 years.

1    And so, you know, I joined a big firm and we took this case on

2    pro bono, but I don't do criminal defense work, so the

3    mechanics of this were new to me.  But, I mean, it -- he was

4    held basically incommunicado as far as I'm concerned down at

5    Butner.  I mean, I would call there.  I would call there.  I

6    would write letters there.  I could not speak with the man.  I

7    don't think I even had a phone conversation with Dr. McIver

8    until about two months ago.

9            And even then it's just -- I mean, I don't want to

10   waste your time explaining about my hard life trying to get in

11   touch with him, but I couldn't communicate with him.  I

12   couldn't get down there to visit him.  That's why we had to get

13   a continuance because they don't respond to my phone calls.  I

14   said, "Am I on the list?"  That's all I wanted to know.  Am I

15   on the visitor list, because I didn't wanted to fly down here

16   and then them say, "You know, you didn't make the proper

17   arrangement."

18           So part of the problem, Judge, was I didn't know what

19   his condition was.  I knew that he had prostate cancer, but,

20   you know, let's face it, there's all kinds of prostate cancer.

21   You know, that generally can be fairly manageable and

22   treatable.  I mean, it's serious obviously.  It's cancer, but

23   some people have cancer of the prostate and live for many

24   years.

25           And it wasn't until more recently that I learned that

27

1  it -- I think from his daughters, as I recall, that it had

2  spread and that it was, you know, metastatic cancer.  And, you

3  know, we had also done some other research into this

4  compassionate release and frankly, as I recall, it didn't look

5  like a very easy road to hoe.

6         And so at that point when we saw, I think, some of

7  hurdles that we had to face because, you know, he wasn't on his

8  -- he wasn't on death's door at that time, literally, you know,

9  going to be dying imminently within a week, a month, whatever

10  it was, and we had our pending motion, you know, we made the

11  judgment to let's see --

12         THE COURT:  Well, I mean he was diagnosed with

13  metastatic prostate cancer in February of 2009.

14         MR. ZEIDENBERG:  That's correct, but I don't think I

15  learned about it.  I don't remember when I would have learned

16  about it and I advised the court of it over the summer, I think

17  the summer of 2009 I think I told the court.  And, you know,

18  you know, whether it was a question of strategy, I can't really

19  tell you, Judge, what our thinking was except that I thought,

20  as looking back and trying to recreate my thoughts was that I

21  thought from either -- either I looked at it or had an

22  associate look at it, that it was a tough road to hoe in

23  getting out on compassionate release, that the standard was

24  pretty high and I wasn't confident.

25         And come to think of it, Judge, as I recall, it had

28

1   to be done through the institution and I had no luck getting in

2   communication with that institution.  I've written letters to

3   the warden there trying to get communications to my client.

4   He's never got a copy of our presentence report, the report

5   that you have there, you know, our memorandum which I mailed to

6   him ten days ago.  He never saw it until about an hour ago.

7   It's -- they won't give it to him.  He's being held 23 and a

8   half hours a day in isolation, a SHU, Special Housing Unit, 23

9   and a half hours a day just like, you know, one of the

10  terrorists at super max in Florence, Colorado.

11          THE COURT:  What's the reason why he's in there,

12  because, you know, it perplexes me in that we've got letters

13  from prisoners who had contact with him, so how would they have

14  contact with him if he's up --

15          MR. ZEIDENBURG:  Well, it's been about the last two

16  months that he's been in SHU.  It's not for disciplinary

17  reasons, but I don't know.  They say it's administrative

18  reasons, you know, housing and space reasons.  I don't know.

19  Again, I can't get an explanation.  You're obviously right he

20  was -- he was not in the SHU, you know, for the majority of the

21  time, but for the last two months he has been.  And you can

22  imagine even if you're a healthy man, what it must be like to

23  be in there.  There's no light.  They don't -- they don't give

24  a clock on the wall.  You don't know whether it's daytime or

25  nighttime.  They pass your food right through a slot in the

29

1    wall.

2            And so, you know, whether I was remiss in not

3    pursuing that I may well have been.  Certainly it's something

4    if we're not successful here that we would have to contemplate

5    pursuing and I would, but I tell you it's a bureaucratic morass

6    over there and they're not just responsive to say the least.

7            But, your Honor, when you look at the cases that are

8    out there where people suffering from either similar or much

9    less serious -- you know, there's people with a whole spectrum

10   of various ailments, you know, diabetes and they've got heart

11   disease and I've got gout and I've got these different

12   conditions, a whole constellation of different symptoms, and

13   the courts have found in some of those cases -- in many of

14   those cases where even when they had sentence ranges, you know,

15   150 months, 140 months, guideline ranges higher than Dr.

16   McIver, the court has gone all the way down to a low enough

17   level that the defendant can go home.  And there's cases also

18   we cite in there where that has been upheld.  It's a

19   discretionary call.

20           And, your Honor, it's a question of compassion.  It's

21   a question of whether, you know, the man can spend the last

22   year or so of his life, which is what Dr. Eisenberger says that

23   he has, with his family or in the SHU and then being traipsed

24   around to various -- his various infirmaries at the -- at

25   Butner.  And for -- for this statute, this guidelines

1   provision, 5H1.4, we submit is designed for someone like Dr.

2   McIver.

3          And if I may, your Honor, I'd like to just continue

4   on because it's all part of that argument which, as the court's

5   found, that the guideline range -- the proper guideline range

6   is 32 and we've withdrawn our objection to that, but it's very

7   important, as I'm sure the court knows, that there is no

8   presumption that that guideline sentence that results from that

9   finding, the 121 months, is reasonable.  There is no

10  presumption of reasonableness.

11         And there isn't a need for an extraordinary reason to

12  divert from that sentence and 3553 requires that the court

13  impose a sentence that is sufficient, but not greater than

14  necessary to provide for just punishment and 121 months is more

15  than what is sufficient.  It is more than what's sufficient.

16         And the guidelines under 3553 talk about four

17  factors.  I just want to touch them -- on those briefly, your

18  Honor.  One of them has to do -- I'll take them in reverse

19  order -- has to do with providing the defendant with training

20  and medical care or other treatment.  That's not applicable to

21  this case.

22         And the third has to do with protecting the public

23  from the defendant.  And your Honor's questions to the

24  prosecutor were exactly right.  The public does not fear --

25  there is not a defendant, I submit, that the court could find

1    would be less of a threat to the public.  He went through an

2    entire life without any brushes with the law.  He abused his

3    prescription pad.  It's been taken from him legally.  He has no

4    access to it.  I mean, the thought that he would be involved in

5    some kind of drug ring, I mean, look at the man.  He's 66 years

6    old now and he's dying of prostate cancer and for now for the

7    first time in his life he's going to get engaged in some kind

8    of a drug conspiracy with people out on the street.  I don't

9    think that that's a credible threat.

10          The third point, your Honor, is deterrence and

11   whether the sentence imposed if you gave him time served would

12   be sufficient deterrence, and I submit that it would.  You have

13   to consider, your Honor, the cohort of Dr. McIver, because I

14   don't think -- and what the guidelines does unfortunately in

15   those calculations that the agent took us through, are

16   guidelines that would apply to any drug dealer anywhere in the

17   United States that was plying his trade.

18          And in some way you say that's fine, everyone should

19   be treated the same.  Well, that sounds great in theory, but in

20   practice you have to look at the realities.  I mean, there are

21   certain people who are engaged in criminal enterprises who that

22   is their life.  That is their lifestyle and to deter them is

23   going to require a different level of a pain threshold, if you

24   will, than a professional doctor or an attorney or any

25   professional.  And that's -- that's just reality.

32

1           And to think that other physicians wouldn't look at

2    what's happened to Dr. McIver and be scared out of their mind

3    because he's gotten 66 months in jail and not 121 months is

4    simply wrong, I think.  I mean, there isn't anyone, any

5    physician that could look at what happened to him and think,

6    you know what, I'll take that risk.  It doesn't look that bad

7    to me.

8           He has lost everything.  He lost his profession.  He

9    lost his home.  His family was made destitute.  He's dying of

10   cancer.  His mother died while he was incarcerated.  He

11   couldn't go to that funeral.  His daughter was married.  He

12   couldn't go to that wedding.  His -- his young daughter, who is

13   eleven years old, is now almost out of her teens.  He missed

14   that entire period of her life.  I mean, you can't look at

15   what's happened to him and think, well, it's really not

16   sufficient, that people look -- will look at this and think

17   it's worth the risk.  I simply don't think that's true.

18           And, Judge, I think you can imagine -- we can all

19   imagine as attorneys -- and I've seen this so far in my white

20   collar practice -- the threat to a defendant who is an

21   attorney, the fear that any type of conviction of any type

22   which will cause him to lose his bar license is an

23   excruciatingly high penalty and appropriate one perhaps.  I'm

24   not disputing that, but one that you can't look at in

25   isolation, and yet the guidelines does.  The guidelines don't

33

1    take that into consideration when they look at that sentence.

2              And, your Honor, as to facts of the case that the

3    prosecutor was recounting and in particular in response to your

4    question about willful blindness, the prosecutor's exactly

5    right in terms of willful blindness does constitute legal

6    guilt.  There's no question about that, that the jury had a

7    basis and the court could properly put that theory, the

8    government could argue it, the jury could find it, but to say

9    that it's legally the same, legal guilt -- willful blindness

10   legally is the equivalent of intentional knowing -- knowing

11   intentional act that's done deliberately as opposed to just

12   turning a blind eye to it.  Legally they're the same.  Morally

13   they're not.  Morally they're not.

14             And the court would certainly be justified and I

15   would expect that it would punish more severely the doctor in a

16   situation where a patient came in and said, "Doc, I'd like a

17   thousand milligrams of oxycodone please and make it snappy.  I

18   have -- you know, I've got to be -- I'm meeting a guy down the

19   street.  He wants to -- I want sell them."

20             Now, that individual made that doctor, that

21   hypothetical doctor may be just as guilty as one who turns his

22   blind eye and ignores all the warning signs that were out

23   there, but morally in terms of what your Honor would do to

24   those two defendants I would think there would be and there

25   should be a difference in the type of sentence they get and I

34

1    think that there is no accounting for that in this guideline

2    that we have before us.  You have 121 months and there is no

3    distinction.

4            Judge, I would also like the court to seriously

5    consider before imposing sentence the letters that you saw and

6    I know -- I know you did read them, because I --

7            THE COURT:  I found one of them very interesting.

8            MR. ZEIDENBURG:  I'm sorry?

9            THE COURT:  I found one of them really interesting.

10            MR. ZEIDENBURG:  Which is that, your honor?

11            THE COURT:  From his daughter that says that he

12    doesn't want to take OxyContin any more, kind ironic, but I

13    read them all.

14            MR. ZEIDENBURG:  It is.  Your Honor, the letters from

15    his fellow inmates, you know, I think that -- I can't imagine

16    what it was like being in Dr. McIver's shoes.  I think about

17    it, you know, someone who's a professional.  It's easier for

18    all of us to, I think, identify with someone who's a

19    professional because we are, and so it's easier to imagine

20    being in that predicament that he found himself in from his own

21    actions.  There's no denying that he is -- he acknowledges and

22    he will tell you that he knows he has done wrong and he's here

23    because of his own conduct.  He knows that.

24            But notwithstanding the despair and the anger that

25    one must feel to be locked away at this age and be way from

1  your family and to be able to put that aside and make a

2  conscious decision of you know what, I'm going to try and help

3  my fellow inmates, I'm going to try and not whine about my

4  situation here, I'm going to try and be constructive, try to be

5  positive and try to help people, and that he was actually able

6  to.

7        And I've spoken to several of these inmates, some of

8  whom have been released.  The individual who's learned Swedish

9  from Dr. McIver whose wife is Swedish now, he can communicate

10  to her.  You know, he couldn't go on long enough about how much

11  that had meant to him, that relationship and the fact that he

12  spent the time to help him.

13        And I think that that -- those are good works, Judge.

14  I mean, I think it says something about the measure of a man

15  and the character of a person that there's something in there

16  that's redeemable and that it should be taken into

17  consideration in sentencing, just as if he has been nothing but

18  trouble in the institution, that could be taken into

19  consideration.

20        You know, I tried to get his work records from --

21  from Butner.  I wrote three or four letters to them asking them

22  for them and, of course, they just ignored my letters, but, you

23  know, going back to the very first point we were making about

24  Butner says they can take care of him, here's an institution

25  that doesn't give him his mail from his attorneys, doesn't

36

respond to his attorney's request for records.  I told them I
needed it for his sentencing hearing.  I did this a month and a
half ago and we get nothing.

It's very disconcerting to think that when they say,
"We've got it covered.  Don't worry.  We'll take good care of
him," I don't have any confidence in that.  I mean, I'm sure
that they're well-meaning people there that work there.  I have
no doubt about that, but as an institution I don't think the
court can have any confidence that his medical needs are going
to be addressed.

THE COURT:  How did you get the medical records from
Butner from the doctor?

MR. ZEIDENBERG:  Judge, it was a real struggle, but
we eventually got them obviously, but that took -- that took
months.  It took months and we eventually got them, but we had
to go through their legal department and finally they, you
know, they did it, but, you know, it's a battle.  It would be
one of those things you have on your to-do list every day, call
Butner.  You do your calls and you call them and then you wait
for the next day and call them again and they never called
back.

Your Honor, the bottom line is, as I think I've
touched on the main points, I wanted to make -- certainly make
them in our pleadings, and I know Dr. McIver would like to make
a brief statement to the court with the court's permission,

1    that his punishment thus far, 66 months, has been sufficient.

2    It has been sufficient.  He has paid an enormous price.

3            And that the court is not -- has been instructed by

4    the Supreme Court this court shouldn't and district court

5    judges should not presume the reasonableness of those guideline

6    sentences.  It's just a starting point.  It's just a starting

7    point and then you have to look at all the 3553 factors and

8    decide whether it's appropriate, but it doesn't take an

9    extraordinary reason to depart from that downwards.

10           And in this case, in fact, I would submit there were

11   and there are extraordinary reasons, his health; that the

12   underlying facts of the case which I think take it out of the

13   heartland of doctor/pill cases, it's not a typical case; the

14   fact there was willful blindness; and the amount he has already

15   had to suffer, losing his home, his family being made

16   destitute.

17           It's -- it's an awful, awful thing, I can only

18   imagine, being helpless and unable to assist your loved ones.

19   His wife wasn't even -- couldn't even get here today because

20   she doesn't have gas money.  She doesn't have money for stamps.

21   So, I mean, they are extremely destitute, made that way because

22   of Dr. McIver's own actions, which he has to take

23   responsibility for and that he will take to his grave.

24           But this is not an individual, unlike some I'm sure

25   the court has seen, I know I have seen, who don't seem to care

38

1    about the repercussions of their own conduct.  Dr. McIver does,

2    and unfortunately those are the people that really pay the

3    highest price because they know they've done wrong.  They're

4    suffering because of what they've done to others.

5            THE COURT:  How is he going to be cared for if

6    they're so destitute?

7            MR. ZEIDENBURG:  I'm sorry?

8            THE COURT:  How is he going to be cared for?

9            MR. ZEIDENBURG:  Your Honor, that's a -- that's a

10   good question.  I am hopeful, given his age, and I'm not any

11   expert, but I believe that his social security and/or Medicaid,

12   he should have benefits under both, I would think.

13           THE COURT:  Well, he probably will, but that's going

14   to take time.

15           MR. ZEIDENBURG:  His daughter -- his daughter is here

16   -- both his daughters are here and they have been extremely

17   supportive of him.  They I have spoken to repeatedly over the

18   course of this engagement and, you know, I think it will be

19   difficult for the family, but I know Dr. McIver has told me and

20   I'm sure he will tell you that his intention, at least at this

21   point, to go out get a job.  And he knows he's not going to be

22   working as a physician, but as told me, you know, he'll take a

23   job as a greeter at Wal-Mart.  He'll do whatever he can, any

24   minimum wage job on up that he can possibly do, and there are

25   jobs he probably can do.  I'm sure that there are people who

39

1    need tutoring, that he could become a paid tutor to help

2    students or what have you.

3              But it's certainly his wish and his family's wish and

4    I think a fair wish that his remaining time on this earth,

5    however short it may be, that it be done in the company of his

6    family and loved ones and that he permitted to live out what I

7    think will likely be a short remainder of his life with dignity

8    outside of the confines of Butner too where he's in a really --

9    really severe conditions.

10             THE COURT:  Be glad to hear from Mr. McIver.

11             MR. WATKINS:  Your Honor, can I respond to the

12   variance motion just briefly?

13             THE COURT:  Yeah, let me hear from him so I keep it

14   together.

15             MR. WATKINS:  Yes, sir.

16             THE COURT:  Yes, sir.  I'll be glad to hear from you.

17             THE DEFENDANT:  Sir?

18             THE COURT:  Be glad to hear from you.

19             THE DEFENDANT:  Well, thank you.  I certainly

20   appreciate your ruling on the 2255.  I think that will

21   underscore people's faith in the judicial system.  It also

22   affords me the opportunity to come to you today and have the

23   audacity to beg for another favor.

24             This has been quite an experience.  I chose at the

25   very first to follow our family tradition and try to make the

40

1   best of a bad situation.  I did that by considering prison

2   along the same lines as a monastery.  If you think about it,

3   prison is kind of a yen to a monastery's yang in that both

4   they're unisex populations that are walled off from the rest of

5   the world from cares, troubles, responsibilities, duties, et

6   cetera and temptations.  Everything is provided for the members

7   without our really having to lift a finger.  We get everything,

8   all basic needs.  And there's lots of time for study and

9   learning and contemplation and service.

10          So using this monastic paradigm I threw myself into

11  that and I put a pretty rigorous educational curriculum

12  together, embarked on a return to my vigorous exercise program

13  of many years and threw myself into teaching as a service

14  opportunity.  There really is a strange need to be of service,

15  which I think I hadn't recognized as such before, but it's

16  definitely there.

17          The -- those legs of that monastic paradigm were

18  fairly easy.  The really tough part was the contemplation and

19  evaluation.  I insisted that I be brutally honest, didn't want

20  to sometimes.  It was very tempting to shy away from -- from

21  looking at the uglier faces of this creature called rotten.

22  And I found that my sins, crimes, transgressions were very

23  shameful, very diametrically opposed to my upbringing, my own

24  moral code and certainly the image I'd like to have of myself,

25  depressingly shameful.

1        And I just felt so much guilt and remorse and at

2   times self-loathing and I think if it hadn't been for the

3   support of my family and friends who not only forgave me, but

4   pointed out some good things, I would really have sunk into

5   despair, but I faced that and having faced it I can't imagine

6   with all that remorse and that shame and that pain ever being

7   tempted to do things like that again.  I just -- I can't even

8   imagine it.

9        But the main reason I'm appealing to you, your Honor,

10  is that my wife has everything on her.  We've always shared the

11  workload.  She was weakened by illness and several years of

12  various tragedies that had preceded my legal problems.  Even

13  when there were two of us working together, it was sometimes

14  overwhelming to do all the things that need to be done and

15  she's doing it all.  I wasn't going to choke up.  I just -- I'd

16  like to be there and give her a breather, just let her rest.

17  Appreciate you listening.

18        THE COURT:  Thank you.  Mr. Watkins.

19        MR. WATKINS:  Your Honor, just very briefly, for the

20  record, regarding the variance motion the government would just

21  like the court to consider just one factor as well, that the

22  drug amount that he's being held responsibility for each of

23  these counts essentially represents one day of prescribing for

24  each of those patients.  He was also found guilty of conspiracy

25  and the government has not objected to the guideline

42

1    calculation, however, if you look at that conduct through the

2    course of the conspiracy, the drug weight would have been

3    tremendous.  And the government's position is he is getting a

4    substantial benefit by the way the writer calculated the

5    guidelines as it is and the government just wanted to put that

6    on the record before your Honor ruled.

7                 THE COURT:  Take a short break.

8                 (Brief recess at 3:20 pm, then reconvened at

9    3:30 pm.)

10                THE COURT:  All right.  I'm aware that there is a

11   national struggle going on between the DEA and pain doctors and

12   I'm aware that people are watching cases around all over.  I

13   think there have only been two tried in this district and their

14   efforts are important to solving a very serious problem, but

15   the -- this case should not be used as an example of sentencing

16   because there are factors that really causes me to

17   exceptionally individualize the sentence.  And I don't think --

18   but the government got its conviction.  It got -- it got

19   affirmed.  I really didn't like finding Mr. Wise ineffective,

20   but that was in my mind the right decision.

21                I'm taking into account -- and what Mr. Watkins said,

22   he really just got tagged with a little bit, but again, in this

23   case it should not be measured as an example of how pain

24   doctors should be punished if they're convicted.  So I've taken

25   into account the -- I frankly believe that Mr. -- and I use

43

1    that term Mr. because you're no longer a doctor -- that the

2    sentence that I will impose will protect the public from

3    further crimes in part because I just don't think he's

4    physically capable of committing any other crimes of this

5    nature.

6            I think he certainly has been deterred and in part

7    that's based on the fact that he cannot practice his profession

8    again, and so I've taken into account the extraordinary

9    physical impairment in this case.  I'm convinced by the doctor

10   from Johns Hopkins that if I gave him 121 months, I might as

11   well give him life.  If I gave him 80 months or 90 months, I

12   might as well give him life.  So I'm not generally a light

13   sentencer, but I believe that he has served sufficiently an

14   amount of time to punish him sufficiently, but not greater than

15   -- than necessary, so I'm going to sentence him to a

16   time-served sentence.

17           He has 14 days in which to file any notice of intent

18   to appeal should he choose to do that.  The government has

19   30 days.  There will be an amended judgment entered up in

20   approximately 10 days or so reflecting that sentence.

21           Any questions?

22           And I also did look at the sentencing guidelines and

23   I'm granting -- it was implicit in what I said.  I am granting

24   a variance primarily on the extraordinary physical impairment

25   that I believe exists.

44

1            So any questions?

2            MR. WATKINS:  Nothing from the government, your

3    Honor.

4            THE COURT:  Thank you.

5            MR. ZEIDENBERG:  Thank you, your Honor.

6                              ***

7    I certify the foregoing is a correct transcript from the record

8    of proceedings in the above entitled matter.

9    S/Jean L. Cole, RMR  10/21/2010

10

11    _____          _____

12    Jean L. Cole, RMR                         Date

13

14

15

16

17

18

19

20

21

22

23

24

25